633-07/WLJ

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
KIA MOTORS CORPORATION, KIA
MOTORS AMERICA INC., and HYUNDAI
MARINE & FIRE INSURANCE CO. LTD.,             **07 CIV 11063 (GBD)**

                                Plaintiffs,

    -against-

ENGAGED FUTURE and EUKOR CAR
CARRIERS INC.,

                                Defendants.
----------------------------------------------------------x

**DEFENDANT EUKOR'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION PURSUANT TO RULE E
TO COMPEL PLAINTIFFS TO ACCEPT SUBSTITUTE SECURITY
OR, ALTERNATIVELY, TO VACATE ATTACHMENT AS ABUSIVE**

                                               FREEHILL HOGAN & MAHAR, LLP
                                               Attorneys for Defendant
                                               Eukor Car Carriers Inc.
                                               80 Pine Street
                                               New York, NY  10005
                                               (212) 425-1900 / (212) 425-1901 fax

Of Counsel
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

NYDOCS1/295926.1

## PRELIMINARY STATEMENT

Defendant EUKOR CAR CARRIERS, INC. ("EUKOR") respectfully submits this Memorandum of Law and the accompanying Unger Affirmation in support of its application pursuant to Rule E to compel Plaintiffs KIA MOTORS CORPORATION, KIA MOTORS AMERICA INC. and HYUNDAI MARINE & FIRE INSURANCE CO. LTD. (collectively, "KIA") to accept substitute security in the form of a North of England P&I Association Letter of Undertaking ("Club LOU") in lieu of the security KIA has already obtained pursuant to Rule B, or, in the alternative, to vacate the attachment as abusive. For the reasons set forth below, EUKOR's application should be granted.

## FACTUAL BACKGROUND

The facts relevant to this application are relatively straightforward and are not in dispute. They are set forth more fully in the accompanying Unger Affirmation and the Court is respectfully referred thereto. In sum, however, the relevant facts are as follows.

Defendant ENGAGED FUTURE ("EF") is the owner of a vessel, the M/V MORNING IVY. EF chartered its vessel to EUKOR. EUKOR, in turn, entered into a bill of lading contract of carriage with KIA to carry KIA's vehicles from Korea to the United States. At or about the time that the vessel arrived in the United States, KIA alleged that vehicles had been damaged by exposure to seawater, claiming that the damage to the vehicles was in the amount of $419,062.80. Unger Aff. ¶3-4.

One of the terms and conditions of the bill of lading contract of carriage between KIA and EUKOR provides that disputes of the nature alleged by KIA are to be resolved by litigation in Korea. KIA nonetheless commenced the instant action, which appears to seek resolution of the merits of its claim here (the Verified Complaint does not make any

reservation of rights to pursue the merits of the claim in Korea, nor has KIA actually commenced an action in Korea with respect to this dispute). Unger Aff. §5-6.

KIA applied to this Court in its Verified Complaint for a Rule B attachment against property in which EUKOR has an interest in this District, seeking to restrain the amount of its claim, $419,062.80. KIA successfully restrained electronic funds transfers in this amount in which EUKOR has an interest. EUKOR, in an effort to free up the cash that had been restrained, offered to KIA the Club LOU in the amount of $519,062.80. Unger Aff. ¶7-8.

The amount offered by EUKOR in the Club LOU far exceeds any amount that KIA could hope to recover. This is because KIA's claim is subject to a statutory limitation. Under the U.S. Carriage of Goods by Sea Act ("COGSA"), recovery is limited to $500 per package or customary freight unit, resulting in maximal recoverable damages (if any) to KIA of $20,000 (if each vehicle is a "package") or $280,000 (if the vehicles are to be judged on a freight unit basis). Alternatively, if Korean law is applied, a different statutory limitation is in effect which would limit KIA's maximal potential recovery to 20,000 SDRs (the equivalent of approximately $30,000 using current exchange rates).[1] Additionally, the Club LOU provides an extra $100,000 over and above the amount sought by KIA in its Verified Complaint and attachment, in order to secure costs and interest as demanded by KIA even though such costs and interest are outside the scope of the attachment authorized by the Court. Unger Aff. ¶4 n.1 and ¶8.

---

[1] To be clear, these recovery amounts assume that, *arguendo*, KIA can recover against EUKOR at all. Since EUKOR was the charterer of the vessel and not its owner, EUKOR is likely not liable for damage caused by exposure of the cargo to seawater, since ordinarily such damage is caused by some unseaworthy condition on the vessel, which is usually the responsibility of the vessel's owner, which here is EF.

NYDOCS1/295926.1                              2

The parties are in agreement that the Club LOU offers KIA valid security that is every bit as good as (if not better than) a bond, and offers KIA more security (in terms of quantum) than the maximum amount KIA presently has a right to attach under the current Court Order authorizing the attachment. Unger Aff. ¶9-15. KIA, however, contrary to long and well-established standard industry practice, has rejected the proffered Club LOU. Unger Aff. ¶16.

This application is made to require KIA to accept the Club LOU as substitute security for the funds that KIA has restrained, or, alternatively, to vacate the attachment as an abuse of process.

## ARGUMENT

### Point I

### THE COURT SHOULD COMPEL KIA TO ACCEPT THE CLUB LOU AS SUBSTITUTE SECURITY

The Court plainly has the requisite authority to compel KIA to accept the proffered Club LOU as substitute security for the restrained funds. Rule E(5)(a) provides in pertinent part as follows:

> Whenever process of maritime attachment and garnishment…is issued the execution of such process shall be stayed, or the property released, ***on the giving of security, to be approved by the court*** or clerk, or by the stipulation of the parties, conditioned to answer the judgment of the court or of any appellate court. The parties may stipulate the amount and nature of such security. ***In the event of the inability or refusal of the parties so to stipulate the court shall fix the principal sum of the bond or stipulation*** at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller.

(Emphasis supplied.) The plain language of Rule E(5)(a) directs that the defendant's property <u>must</u> be released if security approved by the Court is given, and also provides that if the parties cannot agree on the substitute security, the Court <u>must</u> fix the sum of such substitute security.[2]

In addressing how the Court is to assess whether or not to approve substitute security, the Second Circuit has placed the burden on the moving party to demonstrate that the alternative security exists and was valid. <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, 460 F.3d 434, 445 n.5 (2d Cir. 2006). In interpreting this requirement, the Southern District of New York has held that the Court should determine whether the alternative security proffered would "be equivalent to that afforded by a Rule B attachment." <u>The Rice Co. v. Express Sea Transport Corp.</u>, 2007 U.S. Dist. LEXIS 84300, *5-6 (S.D.N.Y. Nov. 15, 2007) (Pauley, J.).

As is typically the case in Rule B attachments, the property restrained in this matter is cash in the form of electronic funds transfers. Plainly, no substitute can ever provide security that is as good as cash, but that is not the standard. Instead, the security afforded by a Rule B attachment need only be as good as a bond from an approved surety, which under Rule E(5) the Court can plainly compel a plaintiff to accept. Here, there can be no argument (and the parties are in fact in agreement) that the Club LOU proffered in this case as substitute security is as good security as – if not better security than – a bond from an approved surety. The financial ability of the North of England to pay KIA in the event that KIA's suit should succeed cannot reasonably be doubted given

---

[2] The quantum to be fixed is not at issue here, since the quantum proffered is the full amount of KIA's claim as set forth in its Verified Complaint (which, as set forth above, well exceeds any possible recovery) plus an additional $100,000 to cover costs and interest, which is far more than can fairly be anticipated at the statutory 6% p.a. interest rate.

NYDOCS1/295926.1                    4

the North of England's "A rating" from Standard & Poors, its substantial assets and its extraordinary reinsurance coverage. *See* Unger Aff. ¶9-15.

Letters of undertaking from International Group P&I Clubs (such as the North of England here) are universally accepted in the maritime industry as valid substitute security for funds restrained pursuant to a Rule B attachment. In a similar context, the Southern District of New York (Haight, J.) has ruled that a letter of undertaking from one of the International Group P&I Clubs was security that should be approved by a Court. In the Matter of Compania Naviera Marasia S.A., 466 F. Supp. 900 (S.D.N.Y. 1979).[3] Judge Haight's holding is directly on point.

> Because the [letter of] undertaking was not given by an authorized domestic surety company, the Clerk quite properly raised the question of whether the security should be "approved" under Rule F(1).
>
> It has been the practice for many years in the maritime industry to accept letters of undertaking given by underwriters, domestic or foreign, in order to avoid the detention of vessels and the expense of posting security in other forms....In such a letter, the underwriter agrees on behalf of its shipowner-assured to appear and defend the claim...to satisfy any judgment, usually up to a stipulated maximum amount...Such underwriters' letters are almost routinely exchanged in litigation between shipowners or cargo interests and shipowners, because the marine insurance world is a relatively small one, the parties, counsel and their underwriters know each other well, and are prepared to enter into such consensual arrangements so as to minimize inconvenience and expense.
>
> \* \* \*
>
> ***In my view, there is no reason why the Court should not approve such an undertaking*** at this preliminary stage, provided that appropriate safeguards are included in the order. Proceedings in this manner will result in savings in respect of premiums or collateral. ***Any device which***

---

[3] Marasia arose in the context of a Rule F proceeding, but the requirement concerning substitute security arising under this rule was essentially the same – that "approved security" needed to be given.

NYDOCS1/295926.1                            5

> *decreases the cost of litigation, without prejudicing the interests of present or potential litigants, is to be encouraged*. Judge Pierce reached this conclusion when, in an unreported order, he approved a comparable letter of undertaking given by a foreign underwriter at the time of filing another shipowner's complaint for exoneration from or limitation of liability. <u>In the Matter of the Complaint of Compagnie Nationale Algerienne de Navigation</u>, 78 Civ. 5972 (LWP). I reach the same conclusion in the case at bar....

<u>Id</u>. at 902-903 (emphasis supplied). This Court, it is respectfully submitted, should approve the Club LOU offered in this action and should, pursuant to Rule E(5), compel KIA to accept the same.

**Point II**

**IN THE ALTERNATIVE, KIA'S ATTACHMENT
SHOULD BE DEEMED ABUSIVE AND VACATED**

KIA has made it plain that the reason it has rejected the Club LOU is not because of any defect in the Club LOU or because of any concerns about the quality of the security proffered. Instead, KIA has rejected the Club LOU in order to gain an unfair advantage over EUKOR. KIA is seeking to compel EUKOR to waive defenses available to EUKOR under the contract (specifically, the mandatory law and venue provisions),[4] or to force EUKOR into a settlement more favorable to KIA. Such use of the Rule B attachment mechanism is plainly abusive, as it seeks to wrongfully obtain far more than the simple provision of security for a claim which is afforded by Rule B. Indeed, if EUKOR was to post a bond, the bond would of course reserve all defenses available to EUKOR in any event, including but not limited to the law and venue provisions found in the contract. It is these same defenses which are highlighted in the Club LOU which KIA

---

[4] Indeed, waiving such defenses would not only prejudice EUKOR's legal position vis-à-vis KIA, but it could also prejudice EUKOR's right of recovery (if any) against the vessel owner, EF.

is improperly demanding be waived in order for it to agree to the Club LOU as substitute security.

It is well established that the Court has the power to vacate abusive Rule B attachments. <u>Royal Swan Nav. Co. v. Global Container Lines, Ltd.</u>, 868 F. Supp. 599 (S.D.N.Y. 1994). We note for the Court that certain aspects of the <u>Royal Swan</u> decision were overruled by the Second Circuit in <u>Aqua Stoli</u>, but the <u>Aqua Stoli</u> Court did not negate the power of an admiralty court to exercise its discretion in such a manner. The Second Circuit, in reversing the decision of the District Court in <u>Aqua Stoli</u>, did not rule that the District Judge had abused his discretion in vacating the attachment (which the District Judge had found to be abusive because it had apparently been brought as a "tit-for-tat" reaction to security that had earlier been obtained elsewhere by the defendant), but simply that the District Judge's application of a (then) recently-created "need-based" test for security was outside of, and contrary to, the purpose of a Rule B attachment as set forth in the Federal Rules. Indeed, the Second Circuit has consistently held that

> [t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge.

<u>Greenwich Marine Inc. v. S.S. ALEXANDRA</u>, 339 F.2d 901, 905 (2d Cir. 1965). *See also* <u>Sierra Rutile Ltd. v. Bomar Resources Inc.</u>, 1990 U.S. Dist. LEXIS 1811, *10 (S.D.N.Y. Feb. 22, 1990) (Keenan, J.), *citing* <u>Commodity Futures Trading Comm. v. British American Commodity Options Corp.</u>, 788 F.2d 92, 94 (2d Cir.), *cert. denied*, 479 U.S. 853 (1986).

In the case at bar, KIA is attempting to utilize its restraint of EUKOR's cash to obtain an unfair tactical advantage. KIA is attempting to keep EUKOR's cash hostage

and is refusing – contrary to standard industry practice and without any *bona fide* reason whatever – to accept as substitute security a standard form Club LOU from the North of England, an International Group P&I Club, purely for the purpose of using its refusal to leverage unwarranted concessions from EUKOR, such as the waiver of valid defenses or settlement on terms that are unfairly unfavorable to EUKOR. This Court should not countenance such improper and abusive tactics and, to the extent it does not require KIA to accept the proffered Club LOU, should pursuant to Rule E(4)(f) vacate the attachment with prejudice.

## CONCLUSION

For all the foregoing reasons, KIA should be compelled pursuant to Rule E to accept the proffered Club LOU as substitute security for the cash it has restrained pursuant to Rule B, or, in the alternative, should vacate the attachment with prejudice in keeping with Rule E(4)(f).

Dated: New York, New York
       December 20, 2007

>                    Respectfully submitted,
>                    FREEHILL HOGAN & MAHAR, LLP
>                    Attorneys for Defendant
>                    Eukor Car Carriers Inc.
>
> By:  _____
>      Michael E. Unger (MU 0045)
>      Lawrence J. Kahn (LK 5215)
>      80 Pine Street
>      New York, NY  10005
>      (212) 425-1900 / (212) 425-1901 (fax)